FILED

2015 Sep-30  PM 04:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

| | | |
|---|---|---|
| REGINA CAGLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 6:14-cv-00079-TMP |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

## I.   Introduction

The plaintiff, Regina Cagle, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Ms. Cagle timely pursued and exhausted her administrative remedies and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Ms. Cagle was forty-four years old at the time of the alleged disability onset date, and she has a high school education.  (Tr. at 26).  Her past work experience includes employment as an appointment clerk, medical assistant, and nurse

assistant. (*Id.*)  Ms. Cagle amended her alleged disability onset date to May 4, 2011.  (Tr. at 19).  She alleges that she became disabled due to multiple sclerosis, high blood pressure, and anxiety.  (Tr. at 168).

When evaluating the disability of individuals over the age of eighteen, the regulations prescribe a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The first step requires a determination of whether the claimant is "doing substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If he or she is, the claimant is not disabled and the evaluation stops.  *Id*.  If she is not, the Commissioner next considers the effect of all of the physical and mental impairments combined.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  These impairments must be severe and must meet the durational requirements before a claimant will be found to be disabled.  *Id*.  The decision depends on the medical evidence in the record.  *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971).  If the claimant's impairments are not severe, the analysis stops.   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  Otherwise, the analysis continues to step three, which is a determination of whether the claimant's impairments meet or equal the severity of an impairment listed in 20 C.F.R. Part. 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's

impairments fall within this category, she will be found disabled without further consideration. *Id.* If she does not, a determination of the claimant's residual functional capacity will be made and the analysis proceeds to the fourth step. 20 C.F.R. §§ 404.1520(e), 416.920(e). Residual functional capacity ("RFC") is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.945(a)(1).

The fourth step requires a determination of whether the claimant's impairments prevent her from returning to past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant can still do her past relevant work, the claimant is not disabled and the evaluation stops. *Id.* If the claimant cannot do past relevant work, then the analysis proceeds to the fifth step. *Id.* Step five requires the court to consider the claimant's RFC, as well as the claimant's age, education, and past work experience, in order to determine if she can do other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can do other work, the claimant is not disabled. *Id.* The burden is on the Commissioner to demonstrate that other jobs exist which the claimant can perform; and, once that burden is met, the claimant must prove her inability to perform those jobs in order to be found disabled. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

Applying the sequential evaluation process, the ALJ found that Ms. Cagle meets the nondisability requirements for a period of disability and DIB and was insured through the date of his decision. (Tr. at 21). He further determined that Ms. Cagle has not engaged in substantial gainful activity since the alleged onset of her disability. (*Id.*) According to the ALJ, the plaintiff's degenerative disc disease of the cervical spine, mild to moderate multiple sclerosis ("MS"), hypertension, anxiety, depression, and borderline intellectual functioning are considered "severe" based on the requirements set forth in the regulations. (*Id.*) He also found that the plaintiff has the nonsevere impairment of cataracts with normal correctible vision. (*Id.*) However, he found that these impairments neither meet nor medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ determined that the plaintiff's assertions concerning the severity and limiting effects of her impairments were not credible. (Tr. at 23). He found that the plaintiff has the RFC to perform light work with certain limitations. (Tr. at 22). "She can occasionally lift up to 20 pounds and frequently lift up to 10 pounds. She can stand and/or walk for two hours and sit for six hours in an eight-hour workday. She would have limitations in her lower extremities with pushing and/or pulling. She can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs, but should never climb ladders/ropes/scaffolds. She

should avoid work areas with hazardous machinery or work areas at unprotected heights.  She has no manipulative or visual limitations.  She can follow simple and detailed instructions and sustain attention for periods of two consecutive hours, but would require all standard work breaks.  She can have occasional contact with the public."  (*Id.*)

According to the ALJ, Ms. Cagle is unable to perform any of her past relevant work, she is a younger individual, has at least a high school education, and is able to communicate in English as those terms are defined by the regulations. (Tr. at 26).  He determined that "[t]ransferability of job skills is not material to the determination of disability," because the claimant is not disabled "whether or not the claimant has transferable job skills."  (*Id.*)  The ALJ found that Ms. Cagle has the residual functional capacity to perform a significant range of light work.  (*Id.*) Even though the plaintiff cannot perform the full range of light work, the ALJ determined that there are a significant number of jobs in the national economy that she is capable of performing, such as marker, cleaner, and router.  (Tr. at 27).  The ALJ concluded his findings by stating that the plaintiff "has not been under a disability, as defined in the Social Security Act, from May 4, 2011, through the date of this decision."  (*Id.*)

## II.    Standard of Review

This court's role in reviewing claims brought under the Social Security Act is a narrow one.  The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied.  *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).  The court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions.  *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  The court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner.  *Id.* "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'"  *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Federal Mar. Comm'n*, 383 U.S. 607, 620 (1966)).  Indeed, even if this court finds that the evidence preponderates against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence.  *Miles*, 84 F.3d at 1400.  No decision is automatic, however, for "despite this deferential standard [for

review of claims] it is imperative that the court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987).   Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability."   20 C.F.R. §§ 404.1527(e), 416.927(d).   Whether the plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).   Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as there is substantial evidence in the record supporting it.

## III.   Discussion

Ms. Cagle asserts that the ALJ's decision is due to be overturned because the ALJ failed to properly credit the opinion of her primary treating physician, disregarded the vocational expert's testimony regarding acceptable absences for light work, and failed to consider the severity of the plaintiff's cervical impairment.

### A.    *Treating Physician's Diagnoses*

The plaintiff contends that the ALJ improperly evaluated her treating physician's opinion. (Doc. 8, p. 12).  A treating physician's testimony is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)) (internal quotations omitted). The weight to be afforded a medical opinion regarding the nature and severity of a claimant's impairments depends, among other things, upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, how consistent the opinion is with the record as a whole, and the specialty of the medical source. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). Furthermore, "good cause" exists for an ALJ not to give a treating physician's opinion substantial weight when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence

supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (*citing Lewis*, 125 F.3d at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (holding that "good cause" existed where the opinion was contradicted by other notations in the physician's own record).

The court must also be aware that opinions such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). The court is interested in the doctors' evaluations of the claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her] condition." *Lewis*, 125 F.3d at 1440. Such statements by a physician are relevant to the ALJ's findings, but they are not determinative, as it is the ALJ who bears the responsibility for assessing a claimant's residual functional capacity. *See, e.g.,* 20 C.F.R. § 404.1546(c).

On July 25, 2012, the plaintiff's treating physician, Dr. LaGanke, completed a Patient Functional Questionnaire.  (Tr. at 333).  Dr. LaGanke stated he had seen the plaintiff fourteen times since December of 2008.  (*Id.*)  He noted that the plaintiff had the diagnoses of multiple sclerosis, hypertension, and leg cramps.  (*Id.*) He opined that, during an eight-hour workday, the plaintiff could sit for one hour at a time with a fifteen-minute break, stand for one hour at a time with a fifteen-minute break, and can walk between zero and one hours at a time with a fifteen-minute break.  (*Id.*)  He further claimed that, during an eight-hour workday, the plaintiff can sit for a total of two to three hours, stand for a total of one to two hours, walk for a total of two to three hours, and must lie down for two to three hours during the day to alleviate pain.  (Tr. at 334).  According to Dr. LaGanke, even under the best circumstances, the plaintiff would miss a total of fifty full or partial days of work over the course of a year.

The ALJ noted that "[r]ecords show she reported she had been diagnosed in 2004, after experiencing numbness and tingling in her left side.  While an MRI in September 2009 showed advanced but stable changes of MS, it was unchanged since October 2008.  Additional testing in August 2011 included an MRI of her brain that continued to show findings consistent with MS."  (Tr. at 23).  He further noted that,

> [L]imitations noted by Dr. LaGanke, that pertain to her MS are minimal and consist only of an ataxic gait and an abnormal tandem walk, as noted in records from the most recent visit evidenced on April 9, 2012. Otherwise, she was neurologically intact and had no visual disturbance associated with MS. The claimant also complained of fatigue, but none of Dr. LaGanke's findings in the treatment records is sufficient to support the medical source statement that is alleged to have been completed by him in July 2012. That assessment showed the claimant's impairments would result in significant limitations in her ability to sustain work activity for an eight-hour workday (Exhibits 1A, 2A, 4F, 16F and 17F). While Dr. LaGanke has been a treating source for a significant period of time, the medical source statement he provided cannot be given significant weight. In fact, the statement is rejected as the conclusions are in the form of a checklist and the treating notes do not provide objective evidence of the limitations asserted. Hence, it is determined to be more of an aide to the claimant's quest for disability benefits rather than an actual assessment based on the severity of her condition.

(Tr. at 23-24). Finally, the ALJ stated that the "[r]ecords show a long history of treatment for MS, but only minimal resulting limitations, with an ataxic gait and abnormal tandem walking noted." (Tr. at 25).

Dr. LaGanke's notes from the plaintiff's visit on December 8, 2008, state that the plaintiff was diagnosed with MS in 2004, and that she has ataxia at times as a side effect and generally complains of fatigue. (Tr. at 212-13). On March 19, 2009, the plaintiff reported for a follow-up appointment with Dr. LaGanke. (Tr. at 216). Ms. Cagle reported that she was "doing very well." (*Id.*) The plaintiff saw

Dr. LaGanke again on July 20, 2009, at which time she reported headaches at least twice per week and that she was absent from work around once per month.  (Tr. at 218).  Dr. LaGanke's notes from September 9, 2009, state that the plaintiff's MRI showed "[a]dvanced but stable changes of MS unchanged since October 14, 2008" and that there were "no new areas of enhancement" and "[n]o evidence of cerebral ischemic or hemorrhagic infarction."  (Tr. at 221).  At the plaintiff's appointment on October 26, 2009, she reported mood swings and increased fatigue, along with increased depression and anxiety.  (Tr. at 222).

On March 1, 2010, the plaintiff reported to Dr. LaGanke that she still had problems with anger and that she was fired from her job and was unable to find work.  (Tr. at 226).  The plaintiff reported that her treatment, Betaseron injections, were hurting and that she no longer could afford them after having lost her job.  She reported trouble focusing at work and chronic fatigue.  (*Id.*)  On June 28, 2010, the plaintiff reported she again was tolerating Betaseron well.  (Tr. at 230).  She again reported chronic fatigue and moodiness.  (*Id.*)  She also reported two falls since her past visit due to her right leg giving out.  (*Id.*)  On October 25, 2010, the plaintiff reported that her injections were making her sore and that she would prefer an oral medication.  (Tr. at 234).  She reported daily severe headaches and chronic fatigue.  (*Id.*)  On January 31, 2011, the plaintiff reported increased leg spasms, but did not

mention chronic fatigue.  (Tr. at 237).  On July 18, 2011, the plaintiff reported tingling on the left side of her head that had persisted for three months, and she reported weakness in her left arm.  (Tr. at 253).  She reported trouble with her short-term memory and unsteady balance.  (*Id.*)  The plaintiff reported a fall that resulted in injury the week prior.  (*Id.*)  The plaintiff had another follow-up appointment with Dr. LaGanke on August 26, 2011, at which she reported persistent fatigue, which served to exacerbate her short-term memory problems. (Tr. at 256).  Dr. LaGanke noted that her MRI revealed areas of widespread demyelination, but that none of the areas was active.  (*Id.*)  On April 9, 2012, the plaintiff reported to Dr. LaGanke that she was tolerating Tysabri well.  (Tr. at 330). She reported unsteady balance, but no falls.  (*Id.*)  She also reported chronic fatigue that was helped with Adipex, and worsening depression.  (*Id.*)  Dr. LaGanke also noted that the plaintiff exhibited an ataxic gait.  (Tr. at 332).

Although the plaintiff's records from Dr. LaGanke consistently indicate issues with her gait and balance, and the plaintiff consistently reported fatigue, the record does not support the limitations Dr. LaGanke alleges in the July 25, 2012, Patient Functional Questionnaire.  The plaintiff's medical records do not indicate that she has any problems sitting for prolonged periods.  The ALJ addressed the plaintiff's limitations with walking and standing by limiting her RFC to standing

and/or walking for two hours during an eight-hour workday.  The ALJ showed in his decision that there was good cause to give lesser weight to the Patient Functional Questionnaire filled out by Dr. LaGanke, because the questionnaire was not supported by Dr. LaGanke's own longitudinal treatment records. Furthermore, the questionnaire deals with Ms. Cagle's RFC and ability to work, two issues that are reserved for the Commissioner because they are dispositive of the plaintiff's case.  *Lewis*, 125 F.3d at 1440.  The ALJ's determination regarding the Patient Functional Questionnaire filled out by Dr. LaGanke is supported by substantial evidence.  The ALJ properly assessed the weight to be given plaintiff's treating physician's assessment.

### B. ALJ Disregarded the Vocational Expert's Testimony Regarding Absences

The plaintiff contends that the ALJ improperly disregarded the Vocational Expert's ("VE") testimony regarding the number of absences that would be acceptable for unskilled or semi-skilled work.  The ALJ acknowledges that the plaintiff "receives an IV once a month for her multiple sclerosis."  (Tr. at 23).  The plaintiff testified at the hearing that, "I take a[n] IV once a month.  It's Tysabri.  So I have to go to [Cullman][1] once a month and I'll sit there for an hour and take an IV, and I'll come home then."  (Tr. at 40).  The plaintiff further testified that she

---

[1]   The transcript indicates a phonetic spelling of "Coleman," however, the plaintiff's brief indicates that she travels to Cullman, Alabama, to receive her IV treatments.  (Doc. 8, p. 13).

goes to doctor's appointments in addition to her monthly IV treatment. (Tr. at 41). The VE testified that "there would not be work available [that the plaintiff could do] [if she was] going to have four absences per month. An employer won't tolerate that many absences." (Tr. at 52). When asked what would be a tolerable absenteeism rate, the VE answered, "[f]or unskilled work, no, no more than one day per month, and most semi-skilled work would be the same." (*Id.*) The plaintiff argues that, because such treatment requires one day per month off work already, the plaintiff would not be able to maintain employment if she missed any additional days. She claims, "[i]t is illogical for the ALJ not to presume that an individual suffering from the multiple severe impairments listed in his decision could not [sic] manage to avoid missing a single additional portion of a day of work over the course of a month due to MS complications, headaches or regular doctor appointments." (Doc. 8, p. 14).

Dr. LaGanke's office is located in Cullman, Alabama. (Tr. at 216). The plaintiff also receives her IV treatments in Cullman, and the treatments take approximately one hour. (Doc. 8, p. 13). The plaintiff has presented no evidence to indicate that she could not schedule her regular doctor visit on the same day she receives the IV treatment, thereby necessitating an absence of no more than one day of work per month. The plaintiff's argument that she necessarily would accrue

additional absences beyond those needed to receive her treatments is based on the

plaintiff's own subjective allegations of the severity of her impairments.  Part of the

ALJ's responsibility is to assess whether such subjective allegations are credible

and supported by objective medical evidence.  In the instant case, the ALJ found

that Ms. Cagle's testimony was not completely credible and was not supported by

evidence in the medical and nonmedical record, stating as follows:

> After careful consideration of the evidence, the undersigned finds that
> the claimant's medically determinable impairments could reasonably
> be expected to cause symptoms; however, the claimant's statements
> concerning the intensity, persistence and limiting effects of these
> symptoms are not credible to the extent they are inconsistent with the
> above residual functional capacity assessment.
>
> The claimant has alleged an inability to work due to her impairments
> and testified to an extreme degree of limitation during the hearing.
> However, this is contradicted by her report of a different level of daily
> activities, when she completed her Function Report – Adult in
> September 2011.  She showed no limitations in performing her
> personal care and indicated she cooked, cleaned, did the laundry, and
> mowed the grass.  She went outside daily, drove, and shopped in
> stores for groceries.  She was able to pay bills, count change, handle a
> savings account, and use a checkbook or money orders.  Hobbies and
> interests included riding a four-wheeler with the children.  She also
> indicated she spent time with others on the phone or computer
> (Exhibit 2E).  The claimant's stepdaughter also completed a Function
> Report – Adult – Third Party and showed activities consistent with
> those reported by the claimant (Exhibit 5E).  With review of the
> reported activities, the undersigned finds the claimant has continued
> to show a level of functioning, inconsistent with her allegations.

Furthermore, medical evidence has not supported the limitations alleged by the claimant.

. . .

In assessing the claimant's level of functioning, the undersigned reviewed a consultative psychological evaluation that was performed by Dr. Gragg on April 16, 2011, in relation to her previous application. While this evaluation was just prior to her amended alleged onset date, it fails to support the limitations alleged by the claimant.  She reported a significant level of daily activities including trying to clean the house, cooking, doing laundry, doing yard work, and resting.   She also reported she had a few friends and rode four-wheelers as a hobby.

. . .

A psychological evaluation performed by Dr. Blotcky on July 3, 2012, was submitted by the claimant's attorney. . . . The claimant reported she spent most of her time preparing simple meals and watching television.  She stated she did not do housework and reported no hobbies and no special interests.  She saw her two children during the week, but indicated she had no close friends.

. . .

The undersigned notes the inconsistencies in the reports by Dr. Gragg and Dr. Blotcky.  Dr. Gragg reported that the bulk of the claimant's background information was derived from the claimant and that its accuracy had not been verified.  However, what was reported to Dr. Gragg differs in multiple respects from what was reported to Dr. Blotcky.  Seemingly, the claimant changed her allegations radically during the examination by Dr. Blotcky.

The evaluation by Dr. Gragg showed the claimant's depressive mood did not rise to a level of [sic] would impede her employability, in fact noting that employment would be helpful to her in terms of alleviating her depressive mood and significant weight is given to the finding reported in his evaluation over that of the evaluation by Dr. Blotcky,

which showed the claimant would have more significant limitations. The exam by Dr. Gragg was not furnished to Dr. Blotcky and his exam seems merely an effort to support the claimant's allegations of disability.

With review of the record, many inconsistencies have been noted. The report by Dr. Blotcky showed the claimant had no hobbies or special interests. However, evidence prior to that evaluation showed the claimant reported hobbies that included riding a four-wheeler. She also told Dr. Blotcky she had no close friends, but the evaluation by Dr. Gragg showed she reported a few close friends. She testified she spent most of her time preparing simple meal[s] and watching television, but stated she did not do housework. However, earlier she reported she cooked as necessary and did household chores including laundry. She also reported she attended church semi-monthly and was able to shop for personal and household needs. She did not require assistance with activities of daily living and her activities were deemed appropriate for independent living. It is also noted that the claimant told Dr. Blotcky she had no arrest record. However, evidence shows she had been arrested and pled guilty in 2006 on a charge of negotiating a worthless instrument, another example or [sic] erroneous reporting by the claimant or by the examiner. The inconsistencies noted severely limit her credibility.

. . .

While the claimant has numerous impairments, which could reasonably result in disabling limitations, records fail to support that severity.

(Tr. at 23-25). In the instant case, the plaintiff has presented no evidence that her impairments will cause her to accrue more than an average of one absence from

work per month to take her IV treatments.  Accordingly, the ALJ's determination is due to be affirmed.

### C. Failure to Consider the Severity of Plaintiff's Cervical Impairment

The plaintiff argues that the ALJ incorrectly addressed the severity of her cervical impairments.  She states that the records indicate that, in addition to the cervical demyelination noted by the ALJ, the plaintiff had three annular tears, four protrusions, and one instance of thecal impingements.  The plaintiff then goes on to explain the nature and potential symptoms of these various issues.  The plaintiff's medical records from August 26, 2011, note disc desiccation at C2-3, a central disc protrusion at C3-4, a broad-based central disc protrusion with thecal impingement and annular tear but no significant stenosis at C4-5, a broad-based central disc protrusion with annular tear but no significant stenosis at C5-6, and a mild central disc protrusion without significant stenosis at C6-7.  (Tr. at 260).  Dr. LaGanke states his impression as an "[a]rea of cervical demyelination at C4-5 and possible other areas of demyelination," and "[m]ild to moderate multilevel cervical degenerative disc disease."  (*Id.*)

The ALJ notes in his determination that, "[a] cervical MRI in August 2011 showed only an area of cervical demyelination at C4-5 and mild to moderate multilevel cervical degenerative disc disease."  (Tr. at 23-24).  The plaintiff

accurately points out that the ALJ did not mention every finding associated with the August 2011 MRI.  However, the plaintiff does not allege any symptoms or limitations caused by those findings that would affect the plaintiff's RFC.  The plaintiff explains what the symptoms of those issues could be, but does not indicate that the plaintiff actually suffers from any of these symptoms.  The plaintiff's medical records also do not support an allegation that she experiences more than mild to moderate symptoms from her cervical impairments.

The ALJ is not required to refer to every piece of evidence in his determination so long as his denial of the plaintiff's claim is not an arbitrary dismissal that does not consider the plaintiff's medical condition as a whole.  *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal citations omitted).  A review of the ALJ's RFC determination persuades the court that the ALJ did consider the plaintiff's medical condition as a whole.  After considering the entire record, the ALJ determined that the plaintiff has the RFC to perform light work with several exceptions.  He specifically addressed the plaintiff's cervical spine impairments in his discussion of the plaintiff's RFC.  It is not the purview of the court to make factual determinations or reweigh the evidence, so long as the ALJ's decision is supported by substantial evidence.  In light of the medical records and

subjective testimony addressed in the ALJ's opinion, the court is convinced that the ALJ's determination is supported by substantial evidence.

## IV.   Conclusion

Upon review of the administrative record, and considering all of Ms. Cagle's arguments, the Court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

DATED this 30th day of September, 2015.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE